FILED

2017 AUG -2  PM 3: 30

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **I N F O R M A T I O N** |
| | ) | |
| Plaintiff, | ) | **1:17  CR  308** |
| | ) | |
| v. | ) | CASE NO.: |
| | ) | JUDGE OLIVER |
| NATASHA JOHNSON, | ) | Title 18, United States Code, Section 286 |
| | ) | |
| Defendant. | ) | |

The United States Attorney charges:

**General Allegations**

At all times relevant to this Information, unless otherwise specified:

1.    Defendant NATASHA JOHNSON ("JOHNSON") was a resident of Cleveland,
Ohio.

2.    M.H. was in the business of preparing income tax returns.  On or about February
4, 2009, M.H. formed Hague United Services ("Hague United") for the purpose of operating her
tax preparation business.  M.H. operated Hague United out of her residence in Shaker Heights,
Ohio, which was located in the Northern District of Ohio.

3.      M.S.H. was M.H.'s brother.  M.S.H. was in the business of preparing income tax returns.  On or about December 1, 2011, M.S.H. formed Hague Financial Services ("Hague Financial") in the State of Ohio for the purpose of operating his tax preparation business.

4.      M.S.H. and JOHNSON were co-workers at the City of Cleveland Water Department (the "Water Department").  In or around 2010, M.S.H. recruited JOHNSON to work for Hague Financial while both she and M.S.H. continued working for the Water Department.

5.      S.S. was a resident of Philadelphia, Pennsylvania.  S.S. was married to R.W., also a resident of Philadelphia, Pennsylvania.

6.      Federal tax law for the years 2009 through 2012 provided for the following refundable tax credits that could be claimed by qualifying persons on their federal income tax returns:

a.      The American Opportunity Credit ("AOC") was an education tax credit of up to $2,500 on the amount of qualified education expenses paid for a student to any college, university, vocational school, or other postsecondary educational institution eligible to participate in a student aid program administered by the U.S. Department of Education.

b.      The Making Work Pay Credit ("MWP") was a tax credit during the 2009 and 2010 tax years for individuals who earned income from work and whose adjusted gross income was less than $95,000 ($190,000 if married filing jointly).  The credit was a percentage of the income earned up to a maximum of $400 ($800 if married filing jointly).

c.      The Earned Income Credit ("EIC") was a tax credit for certain low income working persons.  In addition to other requirements, individuals without qualifying children had to be between the ages of 25 and 65, not be claimed as a dependent on

2

another return, and have an adjusted gross income less than the following to qualify:

$13,440 ($18,440 if married filing jointly) for tax year 2009; $13,460 ($18,470 if married

filing jointly) for tax year 2010; $13,660 ($18,470 if married filing jointly) for tax year

2011; and $13,980 ($19,190 if married filing jointly) for tax year 2012.

d.      The Additional Child Tax Credit ("ACTC") was a refundable credit that could be

claimed by taxpayers who were ineligible to claim the full non-refundable child tax credit

because it exceeded their total tax liability.  The ACTC could have resulted in a tax

refund even if the taxpayer did not owe any tax.

7.      A tax return preparer was a person who completes and files federal income tax

returns on behalf of a taxpayer.

8.      A Preparer Tax Identification Number ("PTIN") was an identification number that

all paid tax return preparers were required to use on U.S. federal tax returns or claims for refund

submitted to the Internal Revenue Service ("IRS").

9.      An Electronic Filing Identification Number ("EFIN") was a number assigned by

the IRS to tax preparers that were accepted into the IRS tax return electronic filing program ("e-

file program"). To become an authorized IRS e-file provider, tax preparers were required to

submit an application and undergo a screening process.

10.      IRS procedures allowed a tax preparer or taxpayer to request payment of a refund

by direct deposit, split into as many as three different financial accounts (including debit card

accounts).   To request split deposits of a refund, the taxpayer listed the account number and

routing number for each deposit on Form 8888 attached to the taxpayer's income tax return.

11.      Turbo Tax and Free Tax were free tax software programs available for use by

taxpayers or professional tax preparers to prepare and electronically file income tax returns.  The

3

software programs enabled a taxpayer to receive a direct deposit refund payment directly into a bank account or onto a debit card.

### The Scheme to Defraud the United States

12.     From approximately January 2010 through April 2013, Defendant NATASHA JOHNSON, and others engaged in a scheme to file federal income tax returns in the names of low income persons (hereinafter, the "claimants") that generated false and inflated tax refunds split typically between the claimants and the conspirators in the scheme. The conspirators used the claimants' personal identification information (hereinafter, "PII") to prepare and electronically file income tax returns in the claimants' names that falsely reported, among other things, unsubstantiated amounts of income, occupation information, educational expenses, and the number of qualifying dependents, which caused false claims for tax refunds.

### A.     Hague United

13.     During the 2009 through 2012 tax filing seasons, M.H. operated Hague United and held herself out as a paid tax return preparer. Through Hague United, M.H. prepared and filed federal income tax returns claiming false tax refunds on behalf of claimants in the Cleveland and Philadelphia areas.

14.     M.H. recruited S.S. and R.W. into the scheme in order to recruit claimants and obtain their PII to provide that information to M.H., who would then prepare and file the false income tax returns in the claimants' names. M.H. and S.S. agreed that M.H. would pay S.S. and R.W. a $1,000 "referral fee" per claimant that S.S. and R.W. recruited for the filing of a false tax return.

15.     From approximately 2010 through 2013, S.S. and R.W., in exchange for payments and promises of payments from M.H. (hereinafter, the "referral fees"), recruited

claimants for M.H. to prepare income tax returns in their names.  S.S. and R.W. gathered PII

from claimants and their dependents, including names, addresses, social security numbers, dates

of birth, and bank account information, and provided that information to M.H. to be used in

preparation of false federal income tax returns.  S.S. and R.W. did not request, and otherwise

rarely obtained, income or employment information from the claimants.  S.S. and R.W. typically

recruited claimants from low income neighborhoods in the Philadelphia area.

16.     Through e-mails and other means, S.S. and R.W. forwarded the PII they collected

to M.H. to use in preparing false tax returns.  M.H. electronically filed the federal income tax

returns from her home in the Northern District of Ohio, Eastern Division.  M.H. had little, if any,

contact with the claimants S.S. and R.W. recruited.  M.H. also rarely, if ever, had information

regarding claimants' actual employment, income, or education expenses, if any.

17.     M.H. filed the federal income tax returns claiming false tax refunds on behalf of

the claimants and directed portions of the refunds into bank accounts controlled by M.H., S.S.,

and R.W.  S.S. and R.W. established and maintained business bank accounts in the name of shell

companies in order to receive their referral fees, which were paid out of portions of the

claimants' tax refunds.

18.     At times, M.H. wrote checks to S.S. to pay S.S. and R.W.'s referral fees.  M.H.

would make false notations on the memo line of the checks in an effort to conceal the true nature

of the payments.

**B.     Hague Financial**

19.     M.H. recruited her brother, M.S.H., into the scheme to defraud the United States.

Among other things, M.S.H. recruited claimants and obtained their PII and provided that

5

information to M.H., who would then prepare and file the false income tax returns in the claimants' names.

20.     M.H. eventually taught M.S.H. how to prepare and file false income tax returns in order to defraud the United States.

21.     From approximately 2010 through 2013, M.S.H., JOHNSON, and others operated Hague Financial, which held itself out as a paid tax return preparation business. At times, M.S.H., JOHNSON, and others conducted Hague Financial's business out of the Water Department during normal business hours. M.S.H. oversaw the operations of Hague Financial, and, among other things, answered telephone calls for Hague Financial, recruited tax claimants through door-to-door and other mass marketing, and prepared income tax returns for individual tax claimants.

22.     In or around 2010, M.S.H. recruited JOHNSON to work at Hague Financial. When JOHNSON began working for Hague Financial, she was primarily responsible for answering telephone calls, recruiting tax claimants through door-to-door and other mass marketing, and collecting PII from claimants, which she forwarded to M.S.H. and M.H. for preparation of individual tax returns. Beginning in approximately August 2011, M.S.H. taught JOHNSON how to file false income tax returns. Thereafter, JOHNSON also began to prepare income tax returns for claimants.

23.     M.S.H., JOHNSON, and others publicly promoted Hague Financial's services through paper flyers and other advertising, word-of-mouth referrals, and door-to-door solicitation. They focused their recruiting and advertising in lower-income neighborhoods in the greater Cleveland area, including in homeless shelters.

24.     From approximately 2010 through 2013, M.S.H., JOHNSON, and others recruited claimants to have income tax returns prepared in their names.  M.S.H., JOHNSON, and others gathered PII from claimants and their dependents, including names, addresses, social security numbers, dates of birth, and bank account information, and used that information to prepare false federal income tax returns.  M.S.H. and JOHNSON generally did not request, and otherwise rarely obtained, income or employment information from the claimants.  In some instances, M.S.H. and JOHNSON intentionally instructed claimants on the amounts of income, educational expenses, or qualifying dependents to be reported in order to increase false tax refunds, without any substantiation or regard for the truth of the information.

25.     Based on the information M.S.H., JOHNSON and others collected, M.S.H., M.H., and JOHNSON electronically filed federal income tax returns, from the Northern District of Ohio, Eastern Division, claiming false tax refunds on behalf of the claimants.  M.S.H., M.H., and JOHNSON directed portions of the refunds into bank accounts they controlled.  Beginning in the 2012 tax filing season, M.S.H. and JOHNSON generally directed the entire refund amount to the claimant and typically charged the claimant a return preparation fee of $1,500.

**C.     The False Tax Returns**

26.     In summary, a large majority of the tax returns the conspirators prepared and filed reported false information and claimed false or inflated tax refunds as follows, among other ways:

a.      The returns reported falsified occupations and amounts of income, often reported as "household help" or "HSH" income, with no corresponding withholding or supporting W-2 or 1099 forms.

b.      The falsified income was generally in a range of between approximately $9,000 and $18,000 for head of household filers and $5,000 and $16,000 for single filers.

c.      Most of the returns falsely reported the same unverifiable occupations, including caregiver, lawn care, tutor, child care, and self-employed.

d.      For claimants between the ages of 25 and 65, the returns generally reported false income and dependents to qualify the claimant for a maximum or near-maximum EIC, often as much as $6,000.

e.      Based on the false income and dependent information, the returns often claimed false Additional Child Tax Credit up to $3,000.

f.      Based on the falsely reported income and educational expenses (often reported in the maximum amount of $4,000), approximately 40% of the returns claimed an AOC of $1,000.

g.      Based on the falsely reported income, many of the returns falsely claimed the maximum MWP Credit in the amount of $400 during the 2009 and 2010 tax years.

27.     The majority of the prepared returns directed a portion of the refund proceeds to the individual claimants either directly into their bank account or onto a debit card, with the remaining portion of the refund proceeds being directed to bank accounts controlled by the conspirators.  In some instances, claimants received less than half of the false refund amounts claimed on their returns.  Many times the portion of the refund directed to the conspirators exceeded the tax return preparation fee quoted to the claimants.

## COUNT 1
### (Conspiracy to Make False Claims, 18 U.S.C. § 286)

28.     From approximately 2010 through April 2013, the exact dates unknown to the United States Attorney, in the Northern District of Ohio, Eastern Division, and elsewhere,

8

Defendant NATASHA JOHNSON, and others known and unknown to the United States Attorney, did knowingly and voluntarily combine, conspire, confederate, and agree together and with each other to defraud the United States by obtaining and aiding to obtain the payment and allowance of false, fictitious, and fraudulent claims, in violation of Title 18, United States Code, Section 286.

## OBJECTS OF THE CONSPIRACY

29.     The objects of the conspiracy were to (a) defraud the United States; (b) file false income tax returns in the names of various individual taxpayers seeking false refund claims; and (c) obtain portions of the refunds for the conspirators' personal use and enrichment.

## MANNER AND MEANS OF THE CONSPIRACY

30.     The manner and means by which the conspiracy was carried out, in the Northern District of Ohio, Eastern Division, and elsewhere, included but were not limited to the following:

a.     The conspirators prepared and filed and caused to be filed false federal income tax returns in the names of low-income claimants that generated false tax refunds.

b.     The conspirators recruited claimants and obtained their PII, but generally not income and employment information, and provided that information to other conspirators who would then prepare and file false income tax returns claiming false tax refunds in the name of the claimants.

c.     The conspirators used the claimants' PII to prepare and electronically file the income tax returns in the claimants' names which falsely reported, among other things, false and unsubstantiated amounts of income, occupation information, and educational expenses, giving rise to false claims for tax refunds.

9

d.      The conspirators held themselves out as legitimate paid tax preparers, when in truth in fact they were not.

e.      The conspirators marketed their tax preparation services through paper flyer and other advertising, word-of-mouth referrals, and door-to-door solicitation, particularly in lower-income neighborhoods, including homeless shelters, in the greater Cleveland and Philadelphia areas.

f.      The conspirators established and maintained business bank accounts in the name of shell companies in order to receive referral fees for recruiting claimants, which referral fees were paid out of portions of the claimants' tax refunds.

g.      The conspirators typically split the fraudulent tax refund proceeds with the claimant, directing a portion of the refund to a bank account or other direct deposit account controlled by the claimant, and directing the remaining portion of the false tax refunds into bank accounts controlled by the conspirators for their personal use and enrichment.

All in violation of Title 18, United States Code, Section 286.

DAVID A. SIERLEJA
Acting United States Attorney

By:  *Ann C. Rowland*

Ann C. Rowland, Deputy Chief
Criminal Division